UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

: 2005 FEB 11  P 3: 07

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| DORAVILLE MANAGEMENT II CORP. by DONALD RAMIREZ, PRESIDENT on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EPIX PHARMACEUTICALS, INC., MICHAEL D. WEBB, PEYTON J. MARSHALL and ANDREW UPRICHARD,<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>**05 CV 10288 PBS**<br><br>JURY TRIAL DEMANDED |

AMOUNT $250.00
SUMMONS ISSUED_____ 4
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____ M.P.
DATE_____ 2/11/05

MAGISTRATE JUDGE_____

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's Complaint, alleges upon the investigation made by and through plaintiff's counsel, which included, inter alia, a review of relevant public filings made by EPIX Pharmaceuticals, Inc. ("EPIX" or the "Company") with the Securities and Exchange Commission (the "SEC"), as well as, tele-conferences, press releases, news articles, analyst reports, and media reports concerning the Company. This complaint is based upon plaintiff's personal knowledge as to plaintiff's own acts, and upon information and belief as to all other matter, based upon the aforementioned investigation.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of investors in the securities of EPIX Pharmaceuticals, Inc. ("EPIX" or the "Company") between March 18, 2002 and January 14, 2005, inclusive (the "Class Period") against the Company; Michael D. Webb, the Company's Chief Executive Officer; Peyton J. Marshall, the Company's Sr. VP, Finance & Administration and Chief Financial Officer; and Andrew Uprichard, the Company's President and

Chief Operating Officer.

2.    EPIX Pharmaceuticals, Inc., formerly known as EPIX Medical Inc. ("EPIX" or the "Company") is a developer of innovative pharmaceuticals used both to improve the capability and expand the use of magnetic resonance imaging ("MRI") as a tool for diagnosing human disease.  MRI is a method of producing extremely detailed pictures of body tissues and organs without the need for x-rays.  The Company's lead product under development, MS-325, is an injectable targeted contrast agent specifically designed for vascular imaging using magnetic resonance angiography ("MRA") to diagnose atherosclerotic disease, including non-coronary artery disease. MRA is an MRI study of the blood vessels.  It utilizes MRI technology to detect, diagnose and aid the treatment of heart disorders, stroke, and blood vessel diseases.

3.    On or before March 18, 2002, defendants became aware of clinical quality issues with the underlying data for their MS-325 Phase III study.  These issues related to the failure of defendants to implement clinical quality management practices to ensure an adequate control group to which MS-325 could be compared.  Defendants knew that without proper regulation of their clinical trial methods, that the FDA's review of the company's additional analyses and interpretations would adversely affect the approval, timeliness of approval or labeling of MS-325.

4.    Defendants progressed MS-325, the Company's principal product in development, through early stage clinical trials.  Following completion of those trials, in December, 2003, the Company submitted a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") for MS-325, which was accepted for filing in February 2004.  In June 2004, the Company's worldwide marketing partner, Schering Aktiengesellschaft ("Schering AG") submitted MS-325 for marketing approval in the European Union.  MS-325 is being co-developed by EPIX and Schering AG. On January 14, 2005, EPIX received an approvable letter from the U.S.

2

Food and Drug Administration (FDA) for MS-325. In the approvable letter, the FDA requested additional studies to support the application for MS-325 in enhanced MRA, contrary to the Company's previous assertions, thus causing the stock to drop significantly.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the  SEC [17 C.F.R. § 240.10b-5].

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company's principal executive offices are located at 71 Rogers Street, Cambridge, Massachusetts 02142, where the day-to-day operations of the Company are directed and managed.

8.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.      Plaintiff Doraville Management II Corp. purchased shares of EPIX Pharmaceuticals, Inc., securities at artificially inflated prices during the Class Period and has been damaged thereby.

10.     Defendant EPIX is a developer of targeted contrast agents both to improve

3

the capability and expand the use of magnetic resonance imaging (MRI) as a diagnostic tool for a variety of diseases.

11.    Defendant Michael D. Webb ("Webb") was, at all relevant times, Chief Executive Officer, a director and Secretary of EPIX.  During the Class Period, defendant Webb benefited from the artificial inflation of EPIX securities by selling 66,254 shares of EPIX stock, for net proceeds of $1.2 million.

12.    Defendant Peyton J. Marshall ("Marshall") was, at all relevant times, Senior Vice President, Finance and Administration and Chief Financial Officer of EPIX.  During the Class Period, defendant Marshall benefited from the artificial inflation of EPIX securities by selling 21,500 shares of EPIX stock, for net proceeds of $372,071.

13.    Defendant Andrews Uprichard ("Uprichard") was, at all relevant times, President, and Chief Operating Officer of EPIX.

14.    Defendants Webb, Marshall and Uprichard are referred to herein as the "Individual Defendants."  Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

15.    The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the results of the collective actions

4

of the Individual Defendants. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of EPIX, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16. As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17. The Individual Defendants participated in the drafting, preparation, and/or

approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with EPIX, each of the Individual Defendants had access to the adverse undisclosed information about EPIX's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about EPIX and its business issued or adopted by the Company materially false and misleading.

18.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who, during the period purchased EPIX securities (the "Class"). Excluded from the Class are the defendants, all of the officers, directors, employees and partners thereof, members of their immediate families and their legal representatives, heirs, predecessors, successors and assigns and any entity in which any of the foregoing has a controlling interest.

20.    The members of the Class are so numerous that joinder of all members is

impracticable. According to the Company's Form 10-Q filed with the SEC on November 2, 2004, as of October 29, 2004, the Company had 23,089,499 shares of its stock outstanding. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe there are hundreds, or thousands, of members of the Class located throughout the United States. Record owners and other members of the Class may be identified from records maintained by EPIX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Throughout the Class Period, EPIX securities was actively traded on NASDAQ.

21.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the financial condition of EPIX;

(c)    Whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)    Whether the market prices of the Company's stock and options were artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)    Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

22.    Plaintiff's claims are typical of the claims of the members of the Class as they and members of the Class sustained damages arising out of the defendants' wrongful conduct in violation of federal securities laws as complained of herein.

23.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

24.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

25.    On March 18, 2002, defendants issued a press release entitled "Positive Phase III MS-325 results reported at ACC." The press release stated in part:

> "The pervasiveness and broad clinical impact of peripheral vascular conditions suggest these results should interest every clinician," said noted cardiologist and MS-325 investigator Emile R. Mohler, III MD, Director of Vascular Medicine at the University of Pennsylvania Health System. MS-325 enhanced MRA may ultimately give cardiologists a minimally invasive tool that will deliver better information than X-ray angiography."
>
> Several additional analyses of clinically important MS-325 features were conducted. MS-325 significantly increased the number of patients whose images were clinically interpretable. *Less than 1% of all MS-325 enhanced MRA images were uniterpretable, while approximately 8% of the x-ray angiograms and 14% of the images obtained with non-contrast MRA were uninterpretable. Furthermore, the radiologists' confidence*

*with interpretations were dramatically improved with MS-325.* When physicians were asked to rate their confidence with interpretations were dramatically improved with MS-325. When physicians were asked to rate their confidence of diagnosis on a 5-point scale, with 5 being the highest rating ("very confident") and 4.0 and 3.0 were respectively "somewhat confident" and "uncertain", MS-325 enhanced MRA diagnoses were rated 4.7, 4.8 and 5.0. Non-contrast MRA confidence levels were 3.1, 4.2 and 4.2.

It is extremely gratifying to reach this important Phase III milestone for MS-325 with such promising results. Although additional studies are ongoing, we believe these data have the potential to establish the equivalency of MS-325 enhanced MRA to x-ray angiography," said EPIX CEO Michael D. Webb. Our confidence is very high that we are on the verge of changing clinical practice in the management of cardiovascular disease, enabling arterial blockages to be diagnosed in a minimally-invasive method, and providing physicians with 3-D visualization of broad fields of the vascular systems with robust, easy-to-use MRI technology.

26.    On March 7, 2003, the Company issued a press release that stated "New positive Phase III MS-325 results at European Congress of Radiology; Second Pivotal Cardiovascular Trial Meets Primary Endpoints, confirms earlier data". The press release stated in part:

The trial met all of its primary clinical endpoints (p less than 0.001), confirming results from a previous Phase III study and providing a strong foundation for the Company's planned NDA submission later in the year, MS-325 is the first blood pool contrast agent for vascular imaging with MR to reach Phase III testing, the final phase in clinical development prior to regulatory submission.

"We are very excited with the latest MS-325 results presented in this prestigious European radiology forum. These latest positive results further strengthen the New Drug Application that we plan to submit to the FDA later this year. They also provide a solid foundation for the European submission", said EPIX CEO Michael D. Webb. "We are confident that we are on the verge of providing a financial tool which could have a significant impact in the diagnosis and management of cardiovascular disease. We believe that upon approval, MS-325 will enable the accurate identification of arterial blockages and abnormalities with a minimally-invasive method, providing physicians with extensive 3-D visualization of the vascular system using robust, easy-to-use MRI technology."

27.    On July 10, 2003, defendants issued a press release entitled "EPIX

Announces Results of Final Phase III Trials of MS-325 for MR Angiography; Renal and Pedal

MRA Studies Meet Primary Endpoints Supporting Broad Vascular Imaging Indication." The press

release stated in part:

> Results from EPIX Medical Inc's final two Phase III MS-325 clinical trials in patients with suspected vascular disease in the renal and pedal arteries (kidneys and feet) were announced today concurrent with the Eleventh Annual Scientific Meeting of the International Society of Magnetic Resonance in Medicine (ISMRM) in Toronto. ***Each trial met its primary clinical endpoint, demonstrating statistically significant improvement in accuracy for detecting renal and pedal vascular disease with MS-325-enhanced magnetic resonance angiography (MRA) compared to non-contrast MRA. These final two Phase III studies further support results from previous Phase III studies and will form the basis for the NDA submission planned for later in the year, requesting a broad MRA indication.*** *(emphasis added)* The company expects MS-325 to be the first contrast agent submitted to the FDA for an MRA indication.
>
> "We believe that these latest study results, as part of the complete MS-325 Phase III database, will provide a very strong package to support the broad use of MS-325 in MRA, which we see as the next generation of MR contrast," said EPIX CEO Michael D. Webb. "Our NDA submission will include the results from all four Phase III MS-325 clinical trials in patients with suspected vascular disease in the aortoiliac, pedal and renal arteries. After recent consultation with the FDA, we continue to believe that our MRA studies in these widely varying vascular areas will support a broad indication for MRA using MS-325."
>
> 'Previous studies with MS-325 support the safety and efficacy of this novel imaging agent in the aortoiliac region, where blood flow can be turbulent. The results of these final two studies confirm the wide range of vascular beds that can be examined using MS-325 MRA," said Gregory Sorensen, M.D., Associate Professor of Radiology at Harvard Medical School and Medical Director for EPIX. Dr. Sorensen further commented, "These Phase III studies show that MS-325 aids the imaging of blood flow to organs such as the kidneys, and areas of slow blood flow such as the feet. The consistency of the results shown in all four Phase III studies has demonstrated that MS-325 should enable physicians to make important decisions about the care of their patients with greater confidence and accuracy."[1]

---

[1] Emphasis is added herein unless otherwise indicated.

28.    On November 10, 2003, the Company issued a press release entitled,

"EPIX Releases MS-325 Safety Data for Renally-Imparied Patients; MS-325 well-tolerated in

population at high risk for cardiovascular disease." The press release stated in part:

> Based on these Phase II studies, MS-325 appears to be safe and well tolerated in patients with varying degrees of renal impairment, including those requiring dialysis, and MS-325 had no adverse effect on renal function. These results extend the safety data from the four already completed Phase III trials of MS-325. The Company plans to submit the New Drug Application for MS-325 enhanced MRA to the FDA before the end of 2003.

> \*        \*        \*

> The success of MS-325-enhanced MRA in all four Phase III trials demonstrates the potential clinical utility of MS-325. The Phase III trials were conducted in 83 clinical sites on 4 continents, and involved 782 patients. *In all four trials, based on blinded interpretation of nearly 4,000 vessels, MS-325 provided significant improvement in diagnostic efficacy compared to non-contrast MRA, and the overall accuracy of MS-325-enhanced MRA was similar to the individual X-ray reader's inter-reader accuracy.* Furthermore, based on administration in 1,438 subject, MS-325 appears to be safe and well-tolerated. EPIX believes that the strength of these Phase III results will support a broad MRA indication for MS-325.

29.    On December 16, 2003, defendants issued a press release entitled "EPIX

Submits MS-325 New Drug Application to FDA; Seeks First U.S. Approval for Magnetic

Resonance Angiography Indication." The press release stated in part:

> EPIX Medical, Inc., a developer of specialty pharmaceuticals for magnetic resonance imaging (MRI), today announced that it has submitted a New Drug Application (NDA) to the Food and Drug Administration (FDA) for MS-325, a contrast agent designed specifically for vascular imaging with magnetic resonance angiography (MRA). MS-325 is being co-developed by EPIX and Schering AG, Germany.

> EPIX is the first company to seek marketing approval in any country for an MR blood pool agent, a new class of imaging agents expected to expand the clinical use of MRI by providing patients and physicians an innovative means for diagnosing vascular abnormalities. The MS-325 NDA is the culmination of an eight-year MRA development program that was discussed with the FDA as the trials progressed. It includes the results

of 18 clinical trials, involving 1,438 subjects who received MS-325. The MS-325 NDA is the first application for marketing approval for an MR contrast agent to be submitted to the FDA for the primary indication of MRA.

After extensive scientific and clinical development, we are extremely pleased to announce the submission of the MS-325 NDA to the FDA for a broad vascular imaging indication outside the heart," commented Michael D. Webb, President and CEO of EPIX. "Currently, the standard diagnostic exam for vascular disease is invasive, catheter-based X-ray angiography. We believe MS-325-enhanced-MRA will provide a valuable alternative to X-ray angiography. In addition, there are a significant number of people with vascular disease who, for medical or other reasons, are unlikely to undergo an X-ray angiogram, and who might benefit from a minimally-invasive MRA exam using MS-325."

"An estimated 62 million people in the United States have some form of cardiovascular disease, which can result in atherosclerotic plaque build-up that causes stroke, heart attack, or limb loss," continued Webb. "In 2002, there were 4.8 million diagnostic angiograms performed in arterial beds outside the heart, and an additional 2.7 million diagnostic angiograms of the coronary arteries. As our population ages, cardiovascular disease is putting an increasing burden on our health care system. We believe that MS-325 will address a large and growing medical need, and that both patients and physicians will rapidly adopt this new, less costly procedure."

About MS-325

MS-325 binds reversibly to human serum albumin, brightening the blood for a prolonged period. This feature may allow physicians to collect more meaningful clinical data using widely available MRI equipment to diagnose and characterize vascular disease. MS-325-enhanced MRA is less invasive than current catheter-based X-ray angiography, and has the potential to provide health care professionals with an alternative to diagnose and manage patients with vascular disease.

30.    On February 17, 2004, the Company issued a press release entitled "EPIX

Announces FDA Acceptance of Filing of MS-325 NDA" that stated, in part:

EPIX Medical, Inc., a developer of pharmaceuticals for magnetic resonance imaging (MRI), today announced that the U.S. Food and Drug Administration (FDA) has determined that the New Drug Application (NDA) submitted for MS-325 (gadofosveset) has been accepted for filing by the Agency and has been designated for a standard review cycle. ***Acceptance for filing indicates that the FDA considers the NDA to be complete and ready for review.*** The target date for first FDA action in the

12

standard review cycle is ten months from the December, 2003 date of submission. MS-325, a contrast agent designed specifically for vascular imaging with magnetic resonance angiography (MRA), is being co-developed by EPIX Medical, Inc. and Schering AG, Germany (NYSE:SHR; FSE:SCH).

"The NDA submission for MS-325 was based on the results of a large Phase III clinical trial program that included four separate studies. We have been working actively with the FDA, and are pleased to move to the next stage of the review process," said Michael D. Webb, President and CEO of EPIX. "We believe that, if approved, MS-325-enhanced MRA will provide a safer way to perform diagnostic angiography. Given the risks that are associated with catheter X-ray angiography, many patients are contraindicated for either the X-ray contrast agent, or the procedure itself. MS-325 has the potential to help address this important medical need."

31.    On March 8, 2004, the Company filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2003. The Annual Report contained the following information:

We believe that MS-325 will significantly enhance the quality of MRI and provide physicians with a minimally-invasive and cost-effective method for diagnosing vascular disease. We also believe that MS-325-enhanced MRA has the potential to simplify the diagnosis of vascular disease and to replace a significant portion of X-ray angiographic procedures, a highly invasive and expensive catheter-based method most frequently used for the detection of vascular disease. In 2002, approximately 7.5 million angiographic procedures were performed in the U.S. for the diagnosis of diseases of the vascular system, of which 4.6 million procedures were by way of X-ray angiography. We believe that MRA will be a less invasive method of imaging a patient's vascular anatomy for the evaluation of disease

The NDA we submitted for MS-325 is based on a 780-patient Phase III clinical trial program designed to test the safety and efficacy of MS-325 for the imaging of peripheral vascular disease. Four Phase III trials were conducted to determine the efficacy of MS-325-enhanced MRA for the detection of vascular disease in the lower abdomen and pelvic regions, in the renal arteries of the kidneys and in the pedal arteries of the feet. *All four trials in the Phase III program for MS-325 met their primary endpoints.* In collaboration with Schering Aktiengesellschaft, or Schering AG, we expect to make analogous regulatory filings in Europe in 2004.

32.    On June 7, 2004, the Company announced that it had completed the sale of a

of $100 million aggregate principal amount of the Company's 3.00% Convertible Senior Notes Due 2024 (the "Notes"). This included an over-allotment purchase of $25 million of the Notes. This offering resulting in proceeds of approximately $96 million to the Company.

33.     The above statements made by the defendants were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)   Defendants failed to adopt and implement clinical quality management practices to deal with test and control scan problems which were ultimately responsible for difficulties in the statistical analysis and determination of efficacy of MS-325;

(b)   The EPIX Phase III protocol for MS-325 permitted clinical investigators to substitute their own standards for MRI imaging;

(c)   Clinical investigators were substituting their own standards for MRI imaging resulting in the use of non-standard, and non-uniform, imaging methods to acquire the non-contrast MRA comparator "control" scans;

(d)   Failure to implement appropriate clinical quality management practices with regard to the method of acquiring non-contrast MRA comparator scans resulted in sufficient variability from study site to site;

(e)   Clinical investigators generated a statistically significant greater number of uninterpretable images during the Phase III trials than is otherwise expected, a result rooted in the absence of clear instruction and defective clinical quality standards as to the requirements for performance of test and non-contrast MRA comparator scan controls;

(f)   problems with uninterpretable images, multiple standards for acquisition of control scans, deficient clinical quality practices, and difficulties in the statistical analysis and determination of efficacy of MS-325 were known to defendants prior to the

submission of the clinical data and results to the FDA; and

        (g)   the problems with the quality of the underlying clinical data and results for the MS-325 NDA, caused by the failure to implement appropriate clinical quality management practices, were so serious so as to prevent the Company from making a case for the efficacy of MS-325, cause resulting diminished prospects for MS-325 to be approved for use by the FDA at the end of the regulatory review cycle.

### THE TRUTH EMERGES

        34.   On January 14, 2005, defendant issued a press release entitled "EPIX Pharmaceuticals Announces Receipt of Approval Letter from FDA for MS-325; Agency Requests Additional Clinical Studies." The announcement informed investors that the FDA had designated MS-325 for approval but that such approval was conditioned only upon resolution of the deficiencies related to the non-contrast MRA comparator scans. In essence, the FDA found that the NDA failed to demonstrate that MS-325 was effective due to the failure in the implementation of the study as set forth herein. The press release stated in part:

> EPIX Pharmaceuticals, Inc., announced today that the U.S. Food and Drug Administration (FDA) has completed its review of the new drug application for MS-325 (gadofosveset trisodium), and found it to be approvable. ***In the approvable letter, the FDA requested additional clinical studies to demonstrate efficacy prior to approval.*** MS-325 is the first in a new class of MRI blood pool contrast agents, and is specifically designed for magnetic resonance angiography (MRA).
>
> ***The FDA indicated that its principal questions continue to relate to the non-contrast MRA comparator scans used in the Phase III trials and to the statistical treatment of uninterpretable images.*** The letter identified no safety or manufacturing deficiencies.
>
> EPIX is continuing its active dialogue with the FDA in order to determine the next steps the Company will need to take to secure the approval of this first-of-its-kind contrast imaging agent. EPIX remains committed to developing MRI cardiovascular imaging pharmaceuticals that enable clinicians to obtain and view clearer scans.

35.    During the conference call held in connection with the January 14, 2005 announcement, defendant Webb explained the implication of the FDA letter:

> First, we can report that the FDA has identified no safety deficiencies that need to be resolved for approval. Second, we can also report that the FDA has not identified any manufacturing deficiencies that need to be resolved before approval. Third, unfortunately the FDA has continued to focus on the efficacy questions raised earlier concerning the method of acquiring the non-contrast baseline comparative scans and the statistical handling of uninterpretable images. The FDA has stated in the action letter that resolution their concerns about these issues must be achieved before approval can be granted. And the FDA believes that resolving these concerns to their satisfaction will require additional clinical studies.

36.    During the conference call, defendant Webb explained the concerns of the FDA in lay terms as follows:

> The FDA is concerned that a standardized non-contrast imaging method was not used at all sites. For the protocol, their institute -- their institutional standard for imaging was employed, sites used different MRI standards and different imaging methods to acquire their non-contrast MRA scans. The agency is concerned that these practice -- these differences in practice between the sites led to variability and non-contrast image quality across the sites.
>
> The agency requested analysis to help us understand whether the specific choice of non-contrast imaging technique affects the results of the Phase III trials. EPIX responded to the FDA with analysis showing the superiority of MS-325 MRA over non-contrast MRA does not fundamentally depend on the choice of the different non-contrast scanning methods. In the action letter, *the FDA continued to express its concern that a lack of standardization in the non-contrast imaging procedures may have generated poorer quality non-contrast MRA images than could have been theoretically obtained if the sites had used a uniform standard method.*
>
> With respect to the second issue on interpretable scans, *the FDA is concerned about what it perceives to be a high rate of uninterpretable non-contrast scans in our pre-specified analysis and that the rate of the uninterpretable scans may have artificially exaggerated the benefit of MS-325.* EPIX has provided reanalysis of the Phase III data based on several alternative methods for the statistical handling of the uninterpretable scan in recent submissions to the FDA.

\*        \*        \*

In summary, the FDA action letter indicates that additional efficacy data is needed for approval.

37.    In essence, the FDA found that EPIX's failure to institute a proper control group to which MS-325 would be compared, i.e., non-contrast images obtained through a standardized testing procedure, may have resulted in artificially exaggerating the benefit of MS-325 as a result of artificially deficient non-contrast images caused by a failure to follow a standardized testing procedure or one previously certified by the FDA for the use of an MRI. Consequently, any statistical analysis obtained from these results was insufficient to demonstrate that MS-325 was comparatively effective.

38.    During the same conference call, defendants were pressed to discuss "the timeline of their requirements going forward." Responding to this and similar questions, defendant Webb noted:

> I think our history in the four Phase III trials is probably what I'd want to comment on which is that we did conduct the four Phase III trials. They were relatively large. We do have a highly experienced machine here in terms of generating the patient enrollment. *It takes several months to get a protocol written and submitted and approved through IRBs at various sites.*
>
> *The Phase III trials we conducted over the last few years, actual patient enrollment time was 9 to 12 months per trial from first injection to final injection. And then of course the blinded read (ph) and the sufficient and rollup of all the data takes many months on the back of that.*

39.    The disturbing news of January 14, 2005, revealed problems with the MS-325 Phase III clinical program so serious that the FDA required entirely new efficacy studies. These problems highlight the aggressive promotion during the Class Period of an otherwise highly deficient and defective clinical program for MS-325 by defendants. Based on this news, the price

17

of EPIX's stock plunged 27%, to $10.67, for a loss of $3.98 per share, on volume of 11 million shares.

## SCIENTER ALLEGATIONS

40.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding EPIX, their control over, and/or receipt and/or modification of EPIX allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning EPIX, participated in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including The Individual Defendants.

41.     Defendants were further motivated to inflate the financial performance of the Company as it permitted EPIX to obtain additional financing through the offering of $100 million in convertible senior notes at terms that it would otherwise not have been able to offer.

42.     Defendants were also motivated during the Class Period to inflate the price of the Company's securities in order to enable the Individual Defendants to sell their personally-held EPIX common stock to the unsuspecting market.  The significant amount of the sales, provide

a strong inference that the defendants were aware of the materially adverse facts concerning the Company and its business and intentionally failed to disclose such known facts to the public as detailed herein.  The sales were as follows:

(a)  Defendant Webb sold a total of 66,254 shares of EPIX stock, in accordance with the following schedule, for net proceeds of $1.2 million:

| Date | Sold | Price | Proceeds | Date | Sold | Price | Proceeds |
|---|---|---|---|---|---|---|---|
| 09/16/2004 | 1,900 | $21.30 | $40,470 | 10/04/2004 | 2,500 | $19.85 | $ 49,625 |
| 09/16/2004 | 1,245 | $21.20 | $26,394 | 10/07/2004 | 2,500 | $17.60 | $ 44,000 |
| 09/16/2004 | 1,032 | $21.35 | $22,033 | 10/08/2004 | 2,500 | $17.90 | $ 44,750 |
| 09/16/2004 | 400 | $21.31 | $8,524 | 10/14/2004 | 1,254 | $16.85 | $ 21,130 |
| 09/16/2004 | 223 | $21.40 | $4,772 | 10/15/2004 | 2,000 | $16.65 | $ 33,300 |
| 09/16/2004 | 100 | $21.32 | $2,132 | 10/21/2004 | 2,160 | $16.25 | $ 35,100 |
| 09/16/2004 | 100 | $21.33 | $2,133 | 10/21/2004 | 340 | $16.25 | $  5,525 |
| 09/17/2004 | 2,500 | $20.83 | $52,075 | 10/22/2004 | 2,500 | $16.50 | $ 41,250 |
| 09/17/2004 | 2,500 | $20.80 | $52,000 | 10/22/2004 | 1,700 | $16.65 | $ 28,305 |
| 09/21/2004 | 564 | $20.65 | $11,647 | 10/22/2004 | 700 | $16.70 | $ 11,690 |
| 09/23/2004 | 2,500 | $20.20 | $50,500 | 10/22/2004 | 100 | $16.75 | $  1,675 |
| 09/24/2004 | 1,526 | $20.35 | $31,054 | 10/28/2004 | 2,500 | $16.10 | $ 40,250 |
| 09/24/2004 | 1,500 | $20.12 | $30,180 | 10/29/2004 | 1,375 | $15.70 | $ 21,588 |
| 09/24/2004 | 1,450 | $20.36 | $29,522 | 10/29/2004 | 1,025 | $15.55 | $ 15,939 |
| 09/24/2004 | 1,000 | $20.12 | $20,120 | 10/29/2004 | 1,000 | $15.60 | $ 15,600 |
| 09/24/2004 | 978 | $20.25 | $19,805 | 10/29/2004 | 1,000 | $15.59 | $ 15,590 |
| 09/24/2004 | 338 | $20.16 | $6,814 | 10/29/2004 | 500 | $15.58 | $  7,790 |
| 09/24/2004 | 72 | $20.37 | $1,467 | 10/29/2004 | 100 | $15.63 | $  1,563 |
| 09/24/2004 | 72 | $20.53 | $1,478 | 11/03/2004 | 2,500 | $15.85 | $ 39,625 |
| 09/29/2004 | 1,000 | $19.61 | $19,610 | 11/03/2004 | 2,500 | $15.75 | $ 39,375 |
| 09/30/2004 | 1,006 | $19.25 | $19,366 | 11/05/2004 | 1,700 | $16.50 | $ 28,050 |
| 09/30/2004 | 1,000 | $19.35 | $19,350 | 11/05/2004 | 800 | $16.30 | $ 13,040 |
| 09/30/2004 | 462 | $19.30 | $8,917 | 11/10/2004 | 2,000 | $16.85 | $ 33,700 |
| 09/30/2004 | 462 | $19.20 | $8,870 | 11/12/2004 | 1,000 | $16.85 | $ 16,850 |
| 10/01/2004 | 1,070 | $19.27 | $20,619 | 11/12/2004 | 1,000 | $16.74 | $ 16,740 |
| 10/01/2004 | 1,001 | $19.30 | $19,319 | 11/12/2004 | 601 | $16.75 | $ 10,067 |
| 10/01/2004 | 1,000 | $19.16 | $19,160 | 11/12/2004 | 500 | $16.75 | $  8,375 |
| 10/01/2004 | 269 | $19.45 | $5,232 | 11/12/2004 | 200 | $16.77 | $  3,354 |
| 10/01/2004 | 230 | $19.32 | $4,444 | 11/12/2004 | 199 | $16.75 | $  3,333 |

(b)   Marshall sold a total of 21,500 shares of EPIX stock, in accordance with the following schedule, for net proceeds of $372,017:

| Date | Sold | Price | Proceeds |
|---|---|---|---|
| 10/04/2004 | 1,500 | $20.00 | $ 30,000 |
| 10/07/2004 | 1,500 | $17.65 | $ 26,475 |
| 10/15/2004 | 1,500 | $16.62 | $ 24,930 |
| 10/22/2004 | 1,500 | $16.70 | $ 25,050 |
| 10/29/2004 | 1,500 | $15.68 | $ 23,520 |
| 11/05/2004 | 1,200 | $16.65 | $ 19,980 |
| 11/05/2004 | 200 | $16.67 | $  3,334 |
| 11/05/2004 | 100 | $16.66 | $  1,666 |
| 11/12/2004 | 1,500 | $16.75 | $ 25,125 |
| 11/17/2004 | 1,500 | $17.05 | $ 25,575 |
| 11/24/2004 | 1,500 | $16.00 | $ 24,000 |
| 11/29/2004 | 1,500 | $17.45 | $ 26,175 |
| 12/10/2004 | 1,500 | $17.72 | $ 26,580 |
| 12/14/2004 | 1,500 | $18.05 | $ 27,075 |
| 12/21/2004 | 1,400 | $17.90 | $ 25,060 |
| 12/21/2004 | 100 | $17.91 | $  1,791 |
| 12/28/2004 | 700 | $17.79 | $ 12,453 |
| 12/28/2004 | 400 | $17.82 | $  7,128 |
| 12/28/2004 | 400 | $17.83 | $  7,132 |
| 01/03/2005 | 365 | $18.15 | $  6,625 |
| 01/03/2005 | 135 | $17.76 | $  2,398 |

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

43.    At all relevant times, the market for EPIX securities was an efficient market for the following reasons, among others:

(a)   EPIX stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market; ff

(b)   As a regulated issuer, EPIX filed periodic public reports with the SEC and the NASDAQ;

(c)   EPIX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  EPIX was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

44.    As a result of the foregoing, the market for EPIX securities promptly digested current information regarding EPIX from all publicly available sources and reflected such information in EPIX stock price. Under these circumstances, all purchasers of EPIX securities during the Class Period suffered similar injury through their purchase of EPIX securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of EPIX who knew that those statements were false when made.

21

## FIRST CLAIM

### Violation of Section 10(b) Of the Exchange Act and Rule 10b-5
### (Against All Defendants)

46.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47.    This Count is asserted against defendants and is based upon section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

48.    During the Class Period, defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase EPIX securities during the Class Period at artificially inflated prices.

49.    During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

50.    As a result of the dissemination of the false and misleading statements set forth above, the market price of EPIX securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other

22

members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing EPIX securities. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

51.    Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

52.    By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of EPIX securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants)

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.    Individual defendants acted as controlling person(s) of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's products, sales, accounting, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

23

statements that plaintiff contends are false and misleading. Individual defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55.    In particular, Individual defendants all had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

56.    By virtue of their position(s) as a controlling person(s), Individual defendants are liable pursuant to section 20(a) of the Exchange Act. As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiff and the other members of the Class against the Defendants for the damages sustained as a result of the wrongdoings of the Defendants, together with interest thereon;

C.    Awarding plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys, and experts;

D.    Granting extraordinary equitable and/or injunctive relief as permitted by

law, equity and federal and state statutory provisions sued on hereunder, including

attaching, impounding, imposing a constructive trust upon or otherwise restricting the

proceeds of Defendants' trading activities or their other assets so as to assure that plaintiff

has an effective remedy; and

E.    Granting such other and further relief as the Court may deem just and

proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

DATED:  February 11, 2005

GILMAN AND PASTOR, LLP

By: _David Pastor_

David Pastor, (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, Massachusetts 01906
Telephone: (781) 231-7850
Facsimile: (781) 231-7840

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Fred Taylor Isquith, Esq.
Christopher S. Hinton, Esq.
270 Madison Avenue
New York, New York  10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF LAWRENCE G. SOICHER**
Lawrence G. Soicher, Esq.
305 Madison Avenue, 46th Floor
New York, N.Y.  10165
Telephone: (212) 883-8000
Facsimile: (212) 697-0877

Attorneys for Plaintiff

391782

25

## PLAINTIFF'S CERTIFICATION

Doraville Management II Corp. ("Plaintiff"), by Donald Ramirez, President, declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in Epix Pharmaceuticals, Inc. securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|------------------------|------------------|-------|
| 10/8/04 | 300 | | $18.27 |
| 10/11/04 | 300 | | $18.62 |
| 1/10/05 | 200 | | $17.00 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31 day of January, 2005.

By: _____
Donald Ramirez, President
Doraville Management II Corp.

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Doraville Management II Corp. by Donald Ramirez, President on behalf of himself and all others similarly situated

## DEFENDANTS

EPIX Pharmaceuticals, Inc., Michael D. Webb, Peyton J. Marshall and Andrew Uprichard

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Dade, Florida
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

David Pastor, Gilman and Pastor, LLP
999 Broadway, S. 500, Saugus, MA 01906
(781) 231-7850

ATTORNEYS (IF KNOWN)

## 05-10288 PBS

## II. BASIS OF JURISDICTION  (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                      AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.   NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 690 Other | | ☒ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 871 IRS — Third Party 26 USC 7809 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

Additional TORTS column:

**PERSONAL INJURY**
☐ 362 Personal Injury — Med. Malpractice
☐ 365 Personal Injury — Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

LABOR additional:
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

## V. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Action for securities fraud under 15 U.S.C. § 78j(b)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE  Saris                    DOCKET NUMBER  05-10166-PBS

DATE
2/11/05

SIGNATURE OF ATTORNEY OF RECORD
David Pash

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)    Doraville Management II Corp., et al. v.
EPIX Pharmaceuticals, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐   I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☒   II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
          740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

☐   III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
           380, 385, 450, 891.

☐   IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
          690, 810, 861-865, 870, 871, 875, 900.

☐   V.   150, 152, 153.

## 05-10288 PBS

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
H.D. Yorston v. EPIX Pharamceuticals, 05-cv-10166-PBS

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐   NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES ☐   NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐   NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☒   NO ☐

   A. If yes, in which division do all of the non-governmental parties reside?
   Eastern Division ☒   Central Division ☐   Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
   Eastern Division ☐   Central Division ☐   Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐   NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  David Pastor, Gilman and Pastor, LLP
ADDRESS  999 Broadway, Suite 500, Saugus, MA 01906
TELEPHONE NO.  781-231-7850

(Coversheetlocal.wpd - 10/17/02)